**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| JOHN C. COLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **8:06CV493** |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | **MEMORANDUM AND ORDER** |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, John C. Coles, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying Coles' applications for benefits under the Social Security Disability Insurance Program.  After carefully reviewing the administrative record and the parties' written arguments, I conclude the SSA decision should be affirmed.

## I.  PROCEDURAL BACKGROUND

Plaintiff applied for Social Security Disability Insurance Benefits on October 8, 2002, contending that symptoms (neck and upper back pain, headaches, dizziness, and depression), resulting from a head injury he sustained in a motor vehicle accident on June 25, 2001 rendered him disabled and unable to work since the date of the accident.

Plaintiff's application was denied initially and after reconsideration.  After a hearing, an administrative law judge (ALJ) issued a decision on February 18, 2005, in which she found the plaintiff was not under a "disability," as defined in the Social Security Act and was not eligible to receive Social Security disability benefits.  On May 19, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. Consequently, the decision of the ALJ stands as the final decision of the Commissioner.

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration.  This action was filed on July 20, 2006.

## II.  FACTUAL BACKGROUND

The administrative record shows the following.

Plaintiff's application for Title II disability benefits states that he was born in 1945 became disabled on June 25, 2001, at age 56, due to a head injury, pain in the neck and upper back, and depression.  Plaintiff had a 12th grade education. He previously worked as a forklift driver, carpenter, and production machine operator.  He was working as a truck driver at the time of his injury.

### A.  Medical Records

On June 25, 2001, plaintiff was injured in a motor vehicle accident when his semi-truck trailer was rear-ended at high speed by a similar vehicle. He lost consciousness for a brief period after the accident.  Plaintiff was admitted to the Butler County Health Care Center ("Butler County") for observation after the accident.

Medical records from Butler County show that plaintiff's initial lab values and X-rays were all negative.  His hospital course was described as "fairly unremarkable."  Plaintiff's vital signs and neurological checks were all within normal limits, although plaintiff complained of left cervical and left occipital pain.  Plaintiff had a large hematoma, which went down during the one-day hospitalization.  He also had some difficulty in the neck and maybe some difficulty swallowing; however, these problems resolved in a short amount of time.  He did have some left cervical pain upon discharge.  Plaintiff complained of some

difficulty with near vision, but his far vision was within normal limits.  There were no deficits in plaintiff's peripheral vision and his funduscopic exam was negative.

A computed tomography (CT) scan of the head conducted at Butler County showed no intracranial pathology, although plaintiff did have some ethmoid opacifications and some aplasia of the frontal sinuses.  The CT study of plaintiff's cervical spine revealed no cervical abnormalities.  Plaintiff did have left maxillary sinusitis.

Plaintiff continued to report some left cervical pain after he was discharged from Butler County.

On July 2, 2001, plaintiff presented to the emergency room at Methodist Hospital ("Methodist") with complaints related to his motor vehicle accident. Specifically, plaintiff reported an episode of confusion wherein he did not recognize his wife. He was admitted to Methodist and evaluated by a neurologist, Robert R. Sundell, M.D. The magnetic resonance imaging (MRI) of the brain conducted on July 5, 2001 was normal. An electroencephalogram (EEG) taken July 3, 2001 was negative.  A carotid Doppler study was near normal. Plaintiff was diagnosed with post-concussion syndrome.

On August 13, 2001, plaintiff was given a CT scan of the head, the results of which were normal.

On February 21, 2002, plaintiff consulted Mark D'Agostino, M.D., of the Methodist Hospital pain clinic, regarding his complaints of shoulder, neck and head pain, secondary to his motor vehicle accident in June 2001.  Dr. D'Agostino prescribed medication, referred plaintiff to a naturopathic doctor specializing in acupuncture-type therapies, and recommended that plaintiff consult a social worker in Methodist's behavior management

-3-

program.  Dr. D'Agostino ordered another MRI of plaintiff's head and neck to rule out any organic etiology for ongoing and worsening head and neck pain.

An MRI taken February 25, 2002 of plaintiff's cervical spine showed some motion artifact, no focal disc protrusion and no central stenosis. There was a minimal interior subluxation of C6 on 7.  Dr. D'Agostino noted that plaintiff was getting some relief with acupuncture and was taking naturopathic remedies to help him sleep.  Dr. D'Agostino recommended that plaintiff continue naturopathic treatment and work to develop coping skills and pain management skills.

The MRI of the brain, also taken on February 25, 2002, showed that plaintiff's brain was "normal for age," and revealed diffuse mucosal thickening in the sinuses.

After a follow-up examination on March 6, 2002, Dr. D'Agostino noted the results of  the MRIs taken on February 25, 2002.  The plaintiff was alert and oriented to person, place and time.  His final assessment was that plaintiff had continued head and neck pain "that may be muscle strain with slight improvement."  Dr. D'Agostino's treatment plan was to continue with the naturopathic approach and work to develop coping skills and pain management skills, a process that would take four to six months.

The results of X-ray studies taken March 13, 2002 of plaintiff's cervical spine were normal.

After a follow-up visit on June 4, 2002, Dr. D'Agostino noted that plaintiff reported his headache pain at a level of "4" on a scale of one to 10, in contrast with plaintiff's initial report to Dr. D'Agostino in February 2002 of a pain score of "8" on the 10-point scale.  Dr. D'Agostino noted that plaintiff had shown some benefit from acupuncture. He emphasized that plaintiff's headaches were "definitely" tension headaches.  Dr. D'Agostino felt there

was nothing more he had to offer Plaintiff in the way of treatment; thus, he recommended that plaintiff be evaluated for admission into the Chronic Pain Management Program (PMP) at the University of Nebraska Medical Center.

On July 11, 2002, plaintiff was seen at the University of Nebraska Medical Center for evaluation, per Dr. D'Agostino's referral. Christopher M. Criscuolo, M.D., found plaintiff would be an "excellent candidate for our behavioral pain program," subject to evaluation by a neuropsychologist, Nancy Willcockson, Ph.D. Dr. Criscuolo noted that plaintiff had tried a number of medications and was currently on Fiorinal. He also noted that Dr. D'Agostino did not recommend any injection therapies.

Plaintiff was examined on July 18, 2002 by Britt A. Thedinger, M.D., otologist and neurotologist. He presented with a history of dizziness following a motor vehicle accident; specifically, he had been having dizziness and imbalance "lasting just seconds." Dr. Thedinger noted that plaintiff has had post traumatic headaches and had a known hearing loss, thought to be secondary to noise exposure. Plaintiff had MRI and several CT scans of the head; Doppler studies revealed no evidence of any intercranial abnormality. Plaintiff's otologic examination was normal. The remainder of the head and neck examination was normal. An ENG examination was completely normal. Plaintiff had a "fairly symmetrial mild to moderate high frequency noise induced sensorineural hearing loss in both ears." Speech discrimination scores were 100% on the right, but only 76% on the left. Dr. Thedinger opined that plaintiff's diagnosis was a central vestibular dysfunction related to his closed head injury. He also had a noise induced sensorineural hearing loss. Plaintiff's restriction should be related to not working above ground level or in any kind of position that would place himself in danger or others if he were to become unsteady or

-5-

dizzy.  Plaintiff would also have significant difficulty hearing with any type of background noise.

During the period from July 24, 2002, to August 1, 2002, Dr. Nancy Willcockson evaluated plaintiff to assess whether he was suffering from a post-concussion syndrome and, if so, whether he had adequate memory functioning to benefit from the Nebraska PMP.  She assigned plaintiff a diagnostic impression of normal cognitive study, chronic pain disorder with medical and psychological features, and depression.  The diagnostic impression ruled out dissociative episodes; migraine with aura, causing memory disturbance; and posttraumatic stress disorder, secondary to reported Vietnam War experiences.

Dr. Willcockson's report reflects that, since July 2001, plaintiff had complained of episodes of amnesia and other symptoms.  He reported that when he has an episode it is like he is in a daze.  Although he knows what is going on around him at the time, he does not recognize things.  He "apparently reports" he doesn't feel well at these times.  He has a headache and dizziness and feels he blocks out the period of time preceding and into the headaches.  Plaintiff stated that as his headache increases in severity he is in "more of a cloud" and things don't seem normal.  He reported suffering from amnestic spells a couple times per week, sometimes lasting an hour or so.  When he feels a headache coming, he takes Tylenol and will sit down.  He says other medications make him dizzy, as does moving his head too quickly.  Plaintiff reported that his memory is great when his pain isn't bad, and when he is "zoned out" he doesn't recall how much pain he is in.  Some episodes are as short as an hour, others last for half the day.

Dr. Willcockson noted several instances of apparent exaggeration of symptoms by plaintiff.  Plaintiff brought in a 22-item list of symptoms and percentages of time he experiences each problem.  It appeared to Dr. Willcockson that the list may have been generated from published literature on head injury or by another professional, as the language for the symptoms was not typical of a layperson's description of their problems. Plaintiff rated some symptoms–headache, sleep difficulties and difficulty swallowing–as occurring 100% of the time.  He also reported that breathing was a problem 70% of the time and heart rate 20% of the time, which were "unusual ratings for an individual in no obvious pulmonary distress."  Plaintiff also reported difficulty with his perceived body temperature, indicating that at times he becomes very hot, and other times was so cold his legs ached; however, plaintiff had not actually taken his temperature during those episodes.  Plaintiff and his wife stated that intermittently he has difficulty with recall and with his ability to perform mental arithmetic.  If he pushes himself, he will get "involuntary tremors."  Plaintiff and his wife believed plaintiff also suffered from sleep apnea, but this possibility had not been evaluated.

Dr. Willcockson discounted plaintiff's report of premorbid intellectual functioning at 149 as being inconsistent with "his vocabulary score [at the 55th percentile rank] which is a good measure of crystallized intellect and a good estimate of premorbid ability." Rather, she found his estimated Wechsler Adult Intelligence Scale-Revised (WAIS-R) was 108, which placed him within the upper end of the average range of intellectual functioning. There was no suggestion of any decline in intellectual functioning.

Plaintiff also told Dr. Willcockson that he had two associates' degrees: (1) in transportation, and (2) in advanced traffic management.  He was working as an over the

-7-

road trucker at the time of the accident.  He stated that his college GPA was 3.97, but his transcripts from Metropolitan Community College revealed that he had a grade-point average of 3.15, which she found consistent with her conclusion that plaintiff's self-report was not supported by the data.

Dr. Willcockson reported there was some indication of grandiose thinking and possible distortion of historical facts, and some magnificant and distortion of his perception of some of his symptoms (e.g., breathing problems 70% of the time secondary to the accident).  Plaintiff's wife's behavior tended to be "very solicitous and indulgent" toward plaintiff; she was very responsive to pain behaviors and other symptoms.  There was no evidence of a thought disorder or hallucinations, and no evidence of active suicidal or homicidal ideation.  Plaintiff's speech and language were within normal limits and memory dysfunction was not evident on interview.

Dr. Nancy Willcockson reported that plaintiff's balance at times appeared unsteady, and at other times was normal.  His breathing was normal, although somewhat heavy on "more stressful tasks."  Dr. Willcockson described plaintiff as "cooperative."  In the middle of the assessment plaintiff complained of headache pain and having trouble recalling direction.  He appeared motivated to do well on the testing and to put forth good effort.

When plaintiff returned for the feedback session, however, he and his wife reported that he had no recollection of ever having been to the office (for about 8 hours), of having any testing performed, and had no recollection of having previously spoken with the evaluator.  Some test procedures were repeated, at which time plaintiff demonstrated procedural knowledge, both by anticipating the manner in which the test was given and by improved performance across measures.  Dr. Nancy Willcockson opined, "His 'amnesia'

-8-

for the entire day is entirely inconsistent with his normal mental status on the day of testing and is not explained by any neurological condition, rather is suggestive of either dissociation or feigned amnesia."  When confronted by the examiner, plaintiff began to report some vague recall.  Thus, Dr. Willcockson suspected the amnesia was feigned.

Plaintiff did not appear to have any persisting neuro-cognitive deficits secondary to his head trauma, and his reported amnestic episodes might be multifactorial in origin. They may be a means by which he coped with pain, with possible self-hypnosis/trance or dissociation during a spell.  The possibility of a migraine aura and migraine causing amnesia could account for some of the reported episodes.  It appeared that plaintiff might also magnify the severity and incidence of these episodes, as well as his perception of his symptoms, for emotional reasons.  Willcockson opined that plaintiff's report of not recalling an entire day of testing was inconsistent with a neurological cause for his reported "amnesia."  Plaintiff's report of episodes of being conversant and looking fairly normal as to others, but amnestic for his wife's name or other personal information was not consistent with neurogenic amnesia.

According to Dr. Nancy Willcockson, the results of plaintiff's neuropsychological evaluation exam were "entirely normal."  However, personality testing and depression screening showed significant emotional distress; he appeared to be suffering from a significant level of depression, as well as chronic pain and headaches, that interfered with his cognitive efficiency and energy level.  She recommended that plaintiff be evaluated for a trial of an SSRI antidepressant, that he be evaluated for a trial of migraine medications, and that he participate in a sleep study.

Dr. Nancy Willcockson concluded that plaintiff had normal memory on testing and would be an excellent candidate for the NHS Pain Management Program.  "Exploration of emotional factors that may also underlie episodes of 'amnesia,' such as symptoms allowing support for dependency/attentional/nurturance needs, would also be helpful to Mr. Coles. "His wife would also benefit from therapy regarding healthy responses [to] her husband's pain, as she is quite indulgent and infantilizing in her support of him when pain behavior is exhibited, which can reinforce and sustain the role and focus on pain in a patient's life."

On August 2, 2002, plaintiff began impatient treatment at the Nebraska Pain Management Program, at which time he underwent a psychological pain assessment conducted by James C. Willcockson, Ph.D., a licensed clinical psychologist.  Dr. James Willcockson noted that plaintiff's regular pain medications were Tylenol and Fioricet; however, plaintiff reported more satisfaction with psychological treatment than from any other modality.   His diagnostic impression was pain disorder associated with both psychological factors and general medical condition; and chronic pain syndrome, involving headache pain, neck pain, and shoulder and back pain.

Dr. James Willcockson opined that plaintiff had "reached the end of medical, pharmacological, and surgical treatments for his pain."  He proposed that Plaintiff enroll in the four-week pain management program so he could learn pain coping skills and strategies that would allow him to function more normally and improve the quality of his life. He would also be encouraged to make emotional, psychological, and attitudinal changes that would allow him to accept his pain and enhance his adjustment to any physical limitations he might experience.

-10-

The physical therapy assessment conducted August 2, 2002 noted that plaintiff's current daily activities included working in the garden with breaks, puttering in his workshop with breaks, doing grocery shopping, laundry, and watching television.

The records of plaintiff's participation in the pain management program revealed certain patterns. For the most part, plaintiff did not exhibit any pain behaviors; however, such behaviors were not totally absent. For example, on August 15, 2002, it was noted that plaintiff displayed pain behaviors, specifically frequent rubbing behaviors. Further, staff perceived that plaintiff's wife enabled his pain behaviors by her solicitous behaviors.

On August 14, 2002, plaintiff told clinical psychologist Todd D. Fleischer that his wife responded to his pain problem with solicitous behaviors. Dr. James Willcockson subsequently noted on August 28, 2002 that plaintiff "expressed concern that [his wife] needed to deal with anger that she has experienced over the feedback she has been given by PMP staff regarding her role in [Plaintiff's] pain management." On August 28, 2002, staff also cautioned plaintiff and his wife that his treatment was at a crossroads. If his dizziness was due to fascial restrictions, there would be a continued reduction in dizziness. If there was no improvement, it was likely the dizziness was "a learned behavior and subject to reinforcement contingencies." There was concern that if this behavior persisted, plaintiff would experience a return of symptoms within a relatively short period of time.

During his participation in the PMP, plaintiff revealed to staff his own perception of his condition. On August 16, 2002, Dr. James Willcockson noted that plaintiff was actually better off than many chronic pain patients on some of the measures, although he was average in the vast majority. Plaintiff's Beck Depression Inventory indicated severe depression and he scored significantly higher than average on pain behaviors. According

to plaintiff, doctors had told him the accident had affected his brainstem; however, progress notes dated August 22, 2002 reflect that Dr. Thedinger had already determined that plaintiff's experiences of dizziness were "benign" and not due to central nervous system (CNS) or PNS damage.

Plaintiff reported a variety of activities during his free time from the PMP. On August 19, 2002, plaintiff told Dr. James Willcockson that he went shooting instead of riding an all-terrain vehicle, as he had planned, and that he worked in the garden, at his wife's request, rather than clean his workbench. On August 27, 2002, plaintiff reported that he had gone to the state fair over the weekend. Plaintiff told Dr. James Willcockson that he was better able to control his headaches and had only two bad ones since starting the pain management program.

On August 22, 2002, physical therapist Giuseppe Siracusano noted that Plaintiff's "behaviors and beliefs regarding 'damage' to his CNS and vestibular system will continue to be address[ed] as the behaviors are noted."

On September 4, 2002, Dr. James Willcockson noted plaintiff's report that his doctor thought he was doing much better and that he should stay in the program for another week. According to plaintiff, his doctor thought that dizziness was due to an inner ear problem or to brain damage and that his memory was fine. Plaintiff complained to his physical therapist of headaches interfering with his sleep and stated, without further explanation, that he was "fighting with his insurance companies."

Plaintiff was discharged from the Pain Management Program on September 6, 2002. The record shows that his discharge testing was quite positive and his "scores improved across virtually every tested dimension."

Dean K. Wampler, M.D., a specialist in occupational medicine, prepared a "second opinion evaluation" on October 1, 2002 for plaintiff's insurance provider. Dr. Wampler noted several inconsistencies that suggested plaintiff had exaggerated his alleged symptoms. Dr. Wampler concluded that plaintiff had "developed a behavioral pattern of total disability that is not warranted by his physical examination or medical data." In reaching this conclusion, Dr. Wampler noted several items of concern.

Dr. Wampler's report states that plaintiff was 15 minutes late for his appointment. He came accompanied by his wife, who was "anxious to contribute to the history and did so whenever Mr. Coles looked at her with an inquisitive eye." At times, plaintiff was "very lucid" when recalling details of events or time frames. Other times, he acted confused as if he didn't understand what Dr. Wampler was asking. "These portrayals changed dramatically within a minute or two , and often times within the same frame of discussion." Dr. Wampler observed that plaintiff focused predominantly on things he could not do, rather than all the things he can do. This focus was contradictory to the principles of pain management clinics.

Dr. Wampler noted that although plaintiff was injured in June 2001, he did not report his injury as a work related problem until May 2002, raising the concern "as potential for secondary gain through different insurance policies." Dr. Wampler also noted a long period of minimal treatment between July 2001 and February 2002, during which time plaintiff merely consulted his personal physician and obtained changes in medication. Alternative treatments, such as acupuncture and pain management clinic, were attempted with minimal benefit. While plaintiff had repeatedly complained that episodes of unforeseen dizziness were a predominant part of his disability and symptom complex, this potential

was watched closely in the pain center.  No falling spells were observed during the four weeks he was there.  "Suddenly, as he has left the program (and constant observation), they are back up to 3 a day."

Dr. Wampler described plaintiff's behavior during the October 1, 2002 examination as "extremely variable."  He observed that people with memory deficits don't have their recollection from minute to minute; they usually have deficits in specific areas of memory that are consistent.  "At times during the interview, Mr. Coles was very lucid; and had very good memory and recall for events.  There were other times where he seemed to suddenly be confused about what was going on, didn't understand my questions, and looked to his wife for assistance."  Such behavior is not expected from brain injury.

The physical examination also showed a great deal of inconsistency.  Plaintiff gave only marginal efforts to requests for strength measurements, with break-away (non-physiologic) weakness.  Plaintiff's efforts for cervical range of motion were vastly different and diminished as compared to the pain clinic physical therapist's discharge evaluation.  Also, the psychological discharge summary suggested much better improvement in function than plaintiff claimed on October 1, 2002.

For all these reasons, Dr. Wampler "strongly suspect[ed] that Mr. Coles portrays a picture of pain and debility far greater than he truly enjoys," and opined that "medical treatment should stop immediately."  Considering the very limited benefits obtained by any treatments administered early on, Wampler believed that Maximum Medical Improvement should have been assigned earlier; however, plaintiff's treating physicians were acting in what they believed to be the patient's best interest.  Maximum Medical Improvement was assigned as October 1, 2002 by Dr. Wampler.

-14-

Dr. Wampler's report concluded it was not possible to assign impairment for plaintiff's alleged episodes of balance disorder or dizziness. Dr. Thedinger, a neuro-otologist, could not identify any objective or pathological findings. He presumed that plaintiff's symptoms were due to closed head injury and concussion, but could not verify organic pathology. Wampler expressed concern about plaintiff's inconsistent claims of dizziness. Impairment of head trauma is typically rated according to the Clinical Dementia Rating (CDR) grid on p. 320 of the AMA Guides to the Evaluation of Permanent Impairment, 5th edition. The patient is evaluated in six segments to determine impairment. Dr. Wampler made the following observations: (1) Memory – plaintiff's memory claims were widely variable and inconsistent with patterns known to be caused by head injury; (2) plaintiff was fully oriented to place and person; (3) although his wife says he has difficulty with problem solving, this claim could not be demonstrated in other settings and was not confirmed by neuropsychological testing; (4) the pain management program shows plaintiff could formulate goals and a plan to meet those goals; (5) there was no way to assess community affairs/involvement with other people; and (6) plaintiff continued to function at home, working in the garden, cleaning his garage, and participating in "what can be deemed as hobbies." He was fully capable of self care. For all these reasons, plaintiff's CDR rating was classified as 0, qualifying him for 0% Permanent Impairment.

As to plaintiff's ability to work, Dr. Wampler concluded that plaintiff portrayed a picture of pain limited by activity and sudden dizzy spells. "I am sure he understands that current problems of sudden dizzy spells preclude him from medical qualification under the Department of Transportation guidelines." However, plaintiff's day to day activities would provide some guidance of the activity he was willing to perform. "I judge his self

description of activity to be within the light-medium work capacity (lifting up to 20 pounds, as defined by the Dictionary of Occupational Titles), with the opportunity to change position and activity periodically through the work shift."  Wampler believed plaintiff was safe and capable of gainful employment and concluded, "He has developed a behavioral pattern of total disability that is not warranted by his physical examination or medical data."

On December 9, 2002, Randy Presler, a physical therapist, conducted a functional capacity evaluation of plaintiff.  Mr. Presler reported to Dr. Wampler that plaintiff exhibited "Symptom Exaggeration" and "Inappropriate Illness Behavior" and that he failed 29 percent of his Validity Criteria giving him an Equivocal Validity Profile, indicating "submaximal effort" during portions of the exam.  In a cover letter to plaintiff's insurer dated December 23, 2002, Dr. Wampler noted Presler's findings of multiple inconsistences and lack of effort demonstrated by plaintiff, e.g., professed limitations that were not consistent with plaintiff's claimed anatomical problems, inconsistencies for functional areas tested in different ways, and a high symptom exaggeration and inappropriate illness behavior index.

Dr. Wampler endorsed Mr. Presler's assessment that plaintiff could do medium work, as defined by the Dictionary of Occupational Titles, including lifting 25 pounds frequently and 50 pounds on occasion.  Dr. Wampler would not assign any other limitations to the plaintiff.

By letter dated January 6, 2003, Dr. Nancy Willcockson advised that she had reviewed plaintiff's transcripts from Metropolitan Community College. These records supported her opinion that plaintiff did not suffer from cognitive deficits or a closed head injury. She noted that Plaintiff's academic performance (GPA 3.15) was consistent with his estimated IQ score of 108.

Peter Michael Daher, M.D., of Creighton Family Health Care, examined the plaintiff on April 4, 2003.  Physically, plaintiff appeared to be a "pleasant" male who was in no acute distress.  He was alert and oriented to time, place and person and was in no distress.  Dr. Daher reviewed plaintiff's medical history and conducted additional examinations, all of which were normal.  As to the cervical spine, "The patient had markedly exaggerated discomfort to palpation, just to light touch of the neck.  As a result, it was very hard to assess his level of discomfort."  During the examination, plaintiff showed no appreciable problem with short-term memory, but appeared to have a moderate amount of depression.  X-rays of the cervical spine showed normal spacing, no arthritic changes, and normal curvature.  An examination of the lumbosacral spine showed normal spacing with normal curvature.  There was some spinal thinning near T12-L1; otherwise just minimal arthritic changes.  Dr. Daher's diagnostic impression was  (1) chronic headaches secondary to cervical spine injury and postconcussion syndrome; and (2) depression.  He concluded:  "The patient is obviously depressed by his exam today.  As to the degree of his musculoskeletal disorder, it did not appear to be apparent on this examination.  The patient does have hyperesthesia which he described in the cervical spine but which does not correspond to the exam also and could very well be a psychosomatic disorder."

By letter dated November 13, 2003, Jack K. Lewis, M.D., a specialist in internal medicine, summarized the history of the treatment he provided plaintiff since shortly after his motor vehicle accident, which consisted of office visits and a number of referrals to specialists for further evaluation. Dr. Lewis opined that plaintiff was "totally disabled from the time of the accident [June 25, 2001] and will remain so forever."

**B.  The Administrative Hearing**

-17-

Plaintiff testified before the ALJ on August 3, 2004 that he was 59 years of age; had attended community college and had two associates' degrees; had worked for nearly 30 years as a truck driver; and had also worked as a forklift driver, carpenter, and machine operator.  He testified he had not worked since his motor vehicle accident in June of 2001 because of pain secondary to his injuries.

Plaintiff testified that activity in general worsened his pain.  Although he could still drive a car, constant pain kept him from driving a truck.  He described the pain, which was located in the head and neck, as "a hundred percent all the time" and stated he never had a good day when he did not have the pain. When his pain was bad, he sat in his chair and sometimes "lost a day."  He could also walk to his garden if he had a steady level of pain. Plaintiff described a recent episode when he frightened a friend because he walked funny, appeared on the verge of falling over, and had to grab at things to steady himself. He reported being "fairly dizzy most days."  When his pain was bad, he felt like he was in a fog and had to sit down and occasionally lie down. Plaintiff testified he took Darvocet for his pain, which helped if he took it at the appropriate time. He also took Effexor to help "keep [him] on one level. [He had] a constant pain of about a level three or four all the time."

Plaintiff further testified that he could sit for one hour and stand at one time for about 15 minutes.  He could walk for one block and could lift from 15 to 18 pounds.  He had trouble with concentration in that he could no longer do mental arithmetic and sometimes could not remember the names of his children and grandchildren. He could go down into the basement to do the laundry; however, he had to stay there until it was all done because he did not go up and down the stairs. He either carried the laundry basket down stairs or pushed it and let it fall.  He washed dishes while seated.  He could do simple food

preparation.  He had to lie down three or four times a day in his recliner for half an hour to two hours.  He testified that he became depressed easily.

Plaintiff gained a large amount of weight after the accident.  During a typical day, plaintiff tried to do some exercise to counteract his weight gain. He fixed his breakfast and lunch. He showered and dressed. He did his dishes and some laundry and walked through his garden, although he did not bend over to pick anything for fear he might get light-headed and fall down.  He visited his friend across the street.  In the evening he watched television and had supper.  Three or four times a week, he drove to the grocery store, which was about 10 minutes away.  Although he did not go out to see movies, he occasionally watched a movie at home, but sometimes he had to get up and walk around. He had two friends who he visited.  Once a month, on his own, he cared for his grandsons, aged 10 months and four years, respectively, for about four hours, during which time he sat in his chair and watched them play or watch cartoons.  When necessary, he changed the baby's diaper.

Plaintiff had worn hearing aids from about 1998 until the accident.  When he wore his hearing aids, he could hear better. He advised the ALJ that he was not wearing his hearing aids at the hearing because they no longer fit in his ear and he could not afford to buy new ones, which would cost about $1500.  He could not recall the name of the doctor he consulted about the hearing aids.

Plaintiff testified he could not remember why his worker's compensation payments ended.

Vocational expert Deb Determan testified as to her opinions, which were based on the following hypothetical question by the ALJ:

-19-

> If the Claimant could occasionally lift or carry 50 pounds; if he could frequently lift or carry 25 pounds; could stand or walk or sit for six hours in an eight-hour day; could frequently do all postural activities except for balancing and that would be only on an occasional basis; and climbing of ladders, ropes or scaffolds would be never; and he has restrictions from an environmental standpoint, should avoid working with concentrated exposure to cold, to vibration and to dangerous equipment or machinery; and then because of his hearing, he needs to avoid even moderate exposure to noise and noisy backgrounds; with that functional capacity, could he return to any of his past work?

(Tr. 562). Based on this hypothetical, Ms. Determan opined that plaintiff was precluded from his past work as a truck driver, production machine operator, carpenter and forklift driver. The noise limitation would keep him from operating production machines.

Plaintiff admitted, however, that wearing hearing aids would improve his hearing. Accordingly, the ALJ asked Ms. Determan:

> assuming he were wearing his hearing aids and his hearing was restored closer to the normal range, do you feel that he could return to any of his past work? And again, he still needs to avoid excessively noisy work environments.

Ms. Determan was initially unable to give an opinion because she had no information about what level of noise would be "excessive." She did note that most employers would probably adhere to OSHA regulations regarding the level of noise in production environments. At this point, the plaintiff admitted that he wore earplugs when he did production work in the factory. Given that information, Determan thought plaintiff could probably return to his past work in production if he wore ear protection.

In summary, Determan opined that the combination of restrictions independent of noise would preclude plaintiff from truck driving, carpentry work and forklift driving; however, he would retain the capacity to perform as a production machine operator. In the State of Nebraska, there are about 1,200 such jobs in the "light exertional category." At

the medium level, there would be 1,000 jobs. Nationally, at the light exertional category, there would be 180,000 jobs; at the medium level there would be 158,000. Determan testified, based on the hypothetical, that plaintiff did not have any other transferable skills to any other type of medium or light work.

If she assumed that the plaintiff's hearing testimony was credible, Determan did not believe plaintiff could return to his job as a production machine operator. The job is in the light exertional category, which would include the ability to stand and walk six hours in an eight-hour day, but plaintiff indicated he had difficulty with dizziness and lightheadedness when walking even short distances. Plaintiff had also indicated he was unable to sustain work activity for eight hours a day and had to rest several times a day. The level of rest contemplated in plaintiff's testimony would preclude competitive employment.

### C.  ALJ's Decision

Considering plaintiff's subjective complaints in light of the objective record, the ALJ found that plaintiff's alleged extreme limitations were not supported by the medical evidence of record. She was also aware that the state worker's compensation agency found that the plaintiff had no limitations whatsoever and she gave weight to the medical basis for that determination. She specifically noted that Dr. Wampler had given plaintiff a zero percent disability rating, had opined that plaintiff could perform medium or light work, and believed plaintiff had developed a behavioral pattern of total disability that was not warranted by his physical examination or medical data.

The ALJ did not give much weight to Dr. Lewis's opinion that plaintiff had a major disability for the rest of his life because Dr. Lewis could not provide a function-by-function limitation, as it was not within his expertise. She also noted that Dr. Lewis's conclusions

were based heavily on the plaintiff's subjective complaints and were at odds with the weight of the objective evidence.

Nor was the ALJ persuaded that plaintiff's depression was as serious as he alleged. She noted that plaintiff was taking appropriate medications without complaints of side effects or ineffectiveness. There was no evidence that plaintiff was undergoing regular counseling or had required inpatient psychiatric counseling that would be consistent with his alleged mental limitations.

Turning to the plaintiff's hearing limitations, the ALJ observed that he did not wear a hearing aid at the hearing, yet could hear the ALJ's questions directed straight at him at a distance of 10 feet. She observed that the plaintiff had been receiving $508 per week from worker's compensation, but stated he could not afford new hearing aids. This information was "puzzling if his hearing was as limited as alleged, especially when he testified that he could hear normal when he had used the hearing aids." The ALJ also found it strange that plaintiff admitted he still had his hearing aids but asserted they no longer fit after his accident, "particularly since such a fabulous claim is not documented in the record."

The ALJ's decision does misstate the plaintiff's testimony regarding the amount of driving he does. Plaintiff testified that he drove a car three or four times a week, taking 10-minute trips to the grocery store, not three or four times a day.

Finally, the Loss of Earnings Capacity report prepared in March 2003 for plaintiff's workers compensation case reflected plaintiff's IQ of 108 and a capacity for plaintiff to perform medium work. Notwithstanding plaintiff's perception of what he could perform, the evaluator believed that plaintiff would be able to perform a wide range of employment and

-22-

had experienced an estimated loss of access of less than 1/10 of the Omaha, Nebraska labor market for performing alternative entry-level employment.

Based on the entire record, the ALJ found that the medical evidence demonstrated that plaintiff had sought treatment for a number of health problems, which tended to support a conclusion that he was prevented from performing some work.  "[B]ut the medical signs, findings, and treating and examining physician reports do not support a finding that the claimant is totally disabled and completely unable to perform all work whatsoever in the national economy."  (Tr. 28).

As to plaintiff's residual functional capacity, the ALJ found:

> In evaluating the entire record, including the testimony and the objective record as a whole, the undersigned finds that the evidence sufficiently demonstrates that during the relevant period under examination, the claimant was sufficiently able to perform medium work as generally defined in the regulations.  Specifically, such work should not allow standing, walking, or sitting more than six hours a day.  Such work may entail all postural activities other than balancing more than occasionally and no climbing ladders or similar items.   Environmental restrictions prohibit extreme cold and vibrations.  Such work should also not involve work around dangerous equipment or machinery.  Finally, any such work should avoid even moderate exposure to noise and noisy backgrounds without hearing protection.  From a mental standpoint he can sustain concentration for routine repetitive unskilled work.

(Tr. 28).

## III.  LEGAL ANALYSIS

### A.  Standard of Review

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues de novo.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial

evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris*, 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). The court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.*; *Morse v. Shalala*, 16 F.3d 865, 870, *vacated on other grounds*, 23 F.3d 1479 (8th Cir. 1994). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000); *Harris*, 45 F.3d at 1193.

The court must "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).

## B.  Issues Presented

Plaintiff contends the ALJ failed to consider his chronic pain disorder, chronic headaches, and central vestibular dysfunction and their effects on his ability to work. He further contends the ALJ failed to properly assess his Mental Residual Functional Capacity.

## C.  Discussion

The court finds that the ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520[1] and 416.920 to determine whether the plaintiff was disabled. In

[1]20 C.F.R. § 404.1520(a) provides:

   **(4) The five-step sequential evaluation process.** The sequential evaluation process is a series
   (continued...)

reaching her decision, the ALJ also found that plaintiff's allegations regarding his limitations were not totally credible.

In light of her finding that the plaintiff had impairments that were considered to be "severe" under the applicable regulations (i.e., cervical neck strain, sensineural hearing loss, and depression), but none so severe as to constitute a listed impairment under Appendix 1[2], the ALJ evaluated plaintiff's residual functional capacity (RFC) in accordance with 20 C.F.R. § 404.1545, finding that plaintiff retained the capacity to perform medium work with specific limitations.

Essentially, plaintiff argues that the ALJ improperly found that he was not disabled and determined his RFC by erroneously discounting the credibility of his testimony and giving little weight to the opinion of Dr. Lewis.  Plaintiff insists that although the record is

---

[1](...continued)
of five "steps" that we follow in a set order.  If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.  If we cannot find that you are disabled or not disabled at a step, we go on to the next step.  Before we go from step three to step four, we assess your residual functional capacity....  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.  These are the five steps we follow:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.... (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.  (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.  (See paragraph (g) of this section and § 404.1560(c).)

The provisions of 20 C.F.R. § 920(a)(4) are virtually identical to those of § 404.1520(a) .

[2]20 C.F.R. Pt. 404, Subpt. P, App. 1

-25-

replete with references to his complaints of pain and fatigue, the existence and duration

of his complaints and his efforts to obtain relief were ignored by the ALJ.

RFC is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R.

§§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*,

including observations by treating or examining physicians or psychologists, family, and

friends; medical records; and the claimant's own description of his limitations.  *Id.* §§

404.1545(a)-(c), 416.945(a)-(c).  *McKinney v. Apfel*, 228 F.3d 860, 863-64 (8th Cir. 2000).

An ALJ may resolve conflicts among various treating and examining physicians, assigning

weight to the opinions as appropriate.  *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir.

2001). Both physical and mental limitations must be considered.

> A disability claimant's subjective complaints of pain may be discounted if
> inconsistencies in the record as a whole bring those complaints into
> question.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In
> assessing the credibility of a claimant's subjective pain complaints, an ALJ
> is to consider factors including the claimant's prior work record; the claimant's
> daily activities; observations of the claimant by third parties and treating and
> examining physicians; the duration, frequency, and intensity of the claimant's
> pain; precipitating and aggravating factors; the dosage, effectiveness, and
> side effects of the claimant's medication; treatment, other than medication,
> for relief of the claimant's pain; and functional restrictions on the claimant's
> activities.  *See id.* Although "an ALJ may not disregard [a claimant's]
> subjective pain allegations solely because they are not fully supported by
> objective medical evidence, an ALJ is entitled to make a factual
> determination that a [c]laimant's subjective pain complaints are not credible
> in light of objective medical evidence to the contrary."  *Ramirez v. Barnhart*,
> 292 F.3d 576, 581 (8th Cir. 2002) (internal citation omitted); *see also*
> *Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir.  2001) (noting that an ALJ
> may discount subjective complaints if there are inconsistencies in the
> evidence as a whole), *cert. denied*, 535 U.S. 908 (2002).

*Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir.  2006) (parallel citation omitted).

Prior to rejecting a claimant's subjective complaints, the ALJ must make an express

credibility determination explaining why he or she does not fully credit the claimant's

complaints. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). An ALJ's findings on credibility are crucial to the proceeding because they affect the determination of RFC and the formulation of any hypothetical presented to the vocational expert. It is well-established that a hypothetical question need only include the impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005), *Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). The court "'will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.'" *Id.*

In the present case, the ALJ properly considered the many inconsistencies between the objective medical evidence and plaintiff's complaints of pain. All of the diagnostic studies of plaintiff's head and/or brain were unremarkable. Studies of his cervical and lumbar spine were consistently within normal range, accounting for arthritic changes due to age. Psychological testing established that plaintiff's IQ and memory were above average and that he had moderate to severe depression. Records from the pain management center were largely negative for observed pain behaviors during plaintiff's four weeks in that program.

The court finds that the ALJ properly discounted the opinion of Dr. Lewis, plaintiff's primary care provider, that plaintiff had a major disability for the rest of his life. A treating physician's opinion is not inherently entitled to controlling weight. *See Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). "A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability.... If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id.* In this case, it appears that the assertion by Dr. Lewis

-27-

that plaintiff "is totally disabled from the time of the accident and will remain so forever" is based largely, and possibly solely, on plaintiff's subjective complaints. Dr. Lewis adjusted plaintiff's pain medications and referred plaintiff to specialists, none of whom could identify any abnormality or condition that would account for plaintiff's alleged symptoms. His opinion is in substantial conflict with all other medical evidence of record.

The ALJ also took into account evidence from multiple medical providers that reasonably suggested that plaintiff exaggerated his symptoms or malingered. Malingering is one of the factors that the ALJ may properly consider when assessing the credibility of a claimant's subjective complaints of pain and other limitations. *See Gonzales v. Barnhart*, 465 F.3d 890 at 895. As discussed above, all of plaintiff's doctors and therapists–except Dr. Lewis– expressed concern that plaintiff was exaggerating his symptoms. The record contains substantial evidence that plaintiff intentionally produced or feigned his alleged limitations. More than one provider observed that plaintiff's wife enabled his pain behaviors by her solicitous behavior. Dr. Wampler observed that no falling spells were observed during the four weeks plaintiff was at the pain management clinic but, "Suddenly, as he has left the program (and constant observation), they are back up to 3 a day."

The ALJ also noted that plaintiff used psychotropic medications without complaints of side effects or ineffectiveness, and there was no evidence that he received mental health counseling, suggesting that his depression was not as serious as alleged. If an impairment can be controlled by treatment or medication, it cannot be considered disabling. *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003), citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).

-28-

The ALJ cited a Loss of Earnings Capacity report prepared March 3, 2003 in conjunction with plaintiff's claim for worker's compensation benefits, that indicated plaintiff's medical condition had resulted in an estimated loss of access to less than one tenth of the Omaha labor market for performing alternative entry-level employment. Further, in October 2002, Dr. Wampler gave plaintiff a zero percent disability rating. While that finding is not binding on the Commissioner, *see* 20 C.F.R. § 404.1504, the ALJ's consideration of the worker's compensation proceeding was appropriate. *See Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

Finally, the ALJ gave proper consideration to the effect of plaintiff's daily activities upon his credibility. Plaintiff's activities that do not reasonably support his subjective complaints are his operating an automobile as needed, caring for his young grandchildren, caring for himself, doing housework and gardening, traveling, and engaging in other hobby activities.

The court further finds that there is substantial evidence in the record to support the ALJ's determination that plaintiff retained the mental residual functional capacity to perform his past job as a production machine operator. The medical evidence showed no suggestion of any decline in intellectual functioning and there is no credible evidence that plaintiff has any memory problems. Plaintiff consistently demonstrated normal auditory attention, visual attention, speed of mentation, and ability to direct attention.

The court finds that (1) the ALJ properly applied the factors set forth in 20 C.F.R. § 404.1529 ("How we evaluate symptoms, including pain"), and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), (2) the ALJ formulated appropriate hypothetical questions for

the vocational expert during the hearing, and (3) the ALJ's credibility findings are supported by substantial evidence.

## CONCLUSION

The court finds that the plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. For the reasons discussed above, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED July 24, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-30-